**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CRISPIN PORTER & BOGUSKY LLC, a limited liability company; MDC PARTNERS INC., a corporation; MITCHELL GENDEL, as an individual and in his capacity as a company officer; DUSTY NELSON, as an individual and in her capacity as a company officer; and DOES 1 through 10 inclusive, whose true names are unknown,

Petitioners,

-against-

RALPH M. WATSON, an individual,

Respondent.

Civil Action No. ___________

**MEMORANDUM OF LAW OF PETITIONERS CRISPIN PORTER & BOGUSKY LLC, MDC PARTNERS INC., MITCHELL GENDEL AND DUSTY NELSON IN SUPPORT OF THEIR MOTION TO DISMISS RESPONDENT'S AMENDED COMPLAINT, OR IN THE ALTERNATIVE TO STAY, AND TO COMPEL ARBITRATION**

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ....... 1

FACTUAL AND PROCEDURAL BACKGROUND PERTINENT TO THIS MOTION ....... 3

A. RESPONDENT EXECUTED THE AGREEMENT. ....... 3

B. RESPONDENT FILED THE COLORADO ACTION. ....... 4

C. RESPONDENT ARGUES COLORADO COURT LACKS AUTHORITY ....... 7

ARGUMENT ....... 7

I. THE PARTIES AGREED TO ARBITRATE. ....... 8

II. THE SCOPE OF THE ARBITRATION AGREEMENT COVERS THE CLAIMS ASSERTED IN THE INSTANT ACTION. ....... 9

A. THE ARBITRATION AGREEMENT COVERS CLAIMS AGAINST ALL THE PETITIONERS. ....... 9

B. THE ARBITRATION AGREEMENT COVERS ALL OF RESPONDENT'S CLAIMS. ....... 13

C. RESPONDENT'S STATUTORY CLAIMS ARE ARBITRABLE. ....... 15

D. A STAY (OR IN THE ALTERNATIVE DISMISSAL) OF THE CASE IS WARRANTED. ....... 15

CONCLUSION ....... 16

This memorandum is respectfully submitted in support of the motion (the "Motion") by Petitioners Crispin Porter & Bogusky LLC ("CP+B"), MDC Partners Inc. ("MDC"), Mitchell Gendel and Dusty Nelson (collectively "Petitioners") to compel arbitration and to dismiss[1] the complaint (the "Amended Complaint") filed by Respondent Ralph M. Watson ("Respondent"), pursuant to Federal Rule of Civil Procedure 12(b)(1) and the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq*.

## PRELIMINARY STATEMENT

At the inception of his employment, Respondent executed and delivered an Employment Agreement with CP+B (the "Agreement"), which contained a broad arbitration provision mandating that all disputes arising between himself and his employer be resolved in final and binding arbitration. The language of the arbitration provision was printed in bold letters in the Agreement, which Respondent executed on April 2, 2014.

Courts have long held that an agreement to arbitrate creates a presumption of arbitrability that is strongly enforced by courts pursuant to the FAA. Respondent executed the Agreement in consideration of his employment and remained employed by CP+B until the Company terminated his employment on February 2, 2018. He expressly assented to the terms of the Agreement – including the arbitration provision – by virtue of, *inter alia*, his execution of the Agreement and his continued employment.

The arbitration provision covers not only claims against CP+B, but those against MDC (CP+B's parent company), MDC's General Counsel, Petitioner Mitchell Gendel, and CP+B's Global Chief Financial Officer, Petitioner Dusty Nelson. Moreover, it is well-settled that all of Respondent's statutory and non-statutory claims are arbitrable, and they are certainly covered by

[1] In the alternative, Petitioners move to stay this action pursuant to 9 U.S.C. § 3 while the arbitration is pending.

the broad arbitration provision in the Agreement. Accordingly, where, as here, all the claims in the instant action are subject to an arbitration agreement, each claim is arbitrable, and the Agreement requires final and binding arbitration of said claims, the case should be stayed or dismissed and arbitration should be compelled.

Respondent filed the Amended Complaint in the United States District Court for the District of Colorado. Petitioners filed a motion in that court to compel arbitration as provided in the Agreement, and to dismiss the Amended Complaint (or in the alternative, to stay the action pending arbitration). Despite deliberately choosing to file the Amended Complaint in Colorado, Respondent's counsel thereafter wrote to Petitioners' counsel and said that the arbitration clause "expressly requires that this motion be filed in a New York court: 'Suits to compel or enjoin arbitration or to determine the applicability or legality of arbitration shall be brought in the United States District Court, Southern District of New York, or if that court lacks jurisdiction, in a state court located within the geographic boundaries thereof.'"

Respondent's counsel also argued that, under 10th Circuit precedent, the District Court in Colorado could not compel arbitration in New York. He asked that Petitioners amend the motion. Petitioners complied with this request, and on August 22, 2018 filed an amended motion with the District of Colorado removing the request that the court compel arbitration, and asking that the action in Colorado be dismissed or stayed pending this Motion being filed in the United States District Court for the Southern District of New York. To comply with Respondent's argument that Petitioners' motion must be made in New York, Petitioners have also filed this Motion seeking to have this Court dismiss the Colorado action or stay it pending arbitration, and to compel arbitration in New York.

## FACTUAL AND PROCEDURAL BACKGROUND PERTINENT TO THIS MOTION[2]

### A. RESPONDENT EXECUTED THE AGREEMENT.

Petitioner CP+B is an advertising agency wholly owned by Petitioner MDC, an advertising and marketing holding company. Petitioner Mitchell Gendel is the General Counsel of MDC and the Vice President and Secretary of CP+B. Petitioner Dusty Nelson is the Global Chief Financial Officer of CP+B. Respondent is a former employee at CP+B, working as the company's Boulder Chief Creative Officer from approximately April 2014 until February 2018. On April 2, 2014, shortly prior to joining CP+B, Respondent executed the Agreement in consideration of his employment. (*See* Declaration of Howard J. Rubin ("Rubin Decl.") at ¶ 1). Section 18 of the Agreement states:

> (a) If any dispute arises between the parties that the parties cannot resolve themselves, including, but not limited to, any dispute, controversy or claim arising out of, relating to, or in connection with this Agreement (including, without limitation, any claim regarding or relating to the interpretation, scope, effect, enforcement, termination, extension, breach, legality, remedies and other aspects of this Agreement and the subject matter of this Agreement), the exclusive remedy for resolving any such dispute, regardless of its nature, shall be arbitration at the offices of JAMS, the Resolution Experts, or successor organization for binding arbitration in New York, New York by a single arbitrator pursuant to the JAMS Employment Arbitration Rules and Procedures…
>
> (b) **The Executive has read and understands this Section 18 which discusses arbitration. The Executive understands that by signing this Agreement, the Executive agrees to submit any claims arising out of, relating to, or in connection with this Agreement, or the interpretation, validity, construction, performance, breach or termination thereof, or his employment or the termination thereof, to binding arbitration, and that this arbitration provision constitutes a waiver of the Executive's right to a jury trial and relates to the resolution of all disputes relating to all aspects of the employer/employee relationship, including but not limited to the following:**
>
> > **(i) Any and all claims for wrongful discharge of employment, breach of contract, both express and implied; breach of the covenant of good faith and fair dealing, both express and implied; negligent or intentional infliction of emotional distress; negligent or**

[2] The facts are taken from Respondent's Amended Complaint and are assumed to be true for the purpose of this motion only.

> **intentional misrepresentation; negligent or intentional interference with contract or prospective economic advantages; and defamation;**
>
> **(ii) Any and all claims for violation of any federal, state or municipal statute, including, without limitation, Title VII of the Civil Rights Act of 1964, as amended, the Civil Rights Act of 1991, the Equal Pay Act, the Employee Retirement Income Security Act, as amended, the Age Discrimination in Employment Act of 1967, the Americans with Disabilities Act of 1990, the Family and Medical Leave Act of 1993, the Fair Labor Standards Act; the New York Human Rights Law, the New York City Administrative Code, the Colorado Antidiscrimination Act of 1957, as amended; the Colorado Civil Rights Act; the Colorado Wage Act; and**
>
> **(iii) Any and all claims arising out of any Federal, state or local laws or regulations relating to employment or employment discrimination.**
>
> **The Executive Further understands that other options such as federal and state administrative remedies and judicial remedies exist and knows that by signing this Agreement, those remedies are forever precluded and that regardless of the nature of the Executive's complaint, the Executive knows that it can only be resolved by arbitration.**

(*See* Rubin Decl. at ¶ 2, Exh. A, § 18) (bold letters in original).

CP+B terminated Respondent's employment "for cause" pursuant to the Agreement on February 2, 2018.

**B. RESPONDENT FILED THE COLORADO ACTION.**

On June 29, 2018, Respondent filed the original Complaint against Petitioners alleging various causes of action in the U.S. District Court for the District of Colorado. On July 19, 2018, he filed the Amended Complaint. According to the Amended Complaint, "Diet Madison Avenue," a collective of anonymous individuals, publicly accused Respondent "of being a sexual harasser" on January 19, 2018. (Rubin Decl. at ¶ 3, Exh. B, ¶ 15-18). CP+B allegedly terminated Respondent "as a direct result of Diet Madison Avenue's false statements, pressure and interference." (*Id.* at ¶ 26). Respondent claims CP+B made the decision to terminate Respondent "based on vague and unspecified allegations of sexual harassment," but that CP+B has failed to provide adequate justification for his "for cause" termination. (*Id.* at ¶ 28-29).

Petitioners flatly dispute these allegations.

The Amended Complaint thereafter sets forth a variety of contradictory and groundless allegations. First, Respondent claims CP+B discriminated against him in its termination decision based on Respondent's age, an allegation based solely on the alleged fact that "Plaintiff is informed and believes that after his termination, his job duties were performed by substantially younger, less qualified employees." (*Id.* at ¶ 39). Respondent next asserts a claim for "Reverse Sex Discrimination." (*Id.* at ¶ 46-56). That claim is also devoid of a factual basis and relies only on the conclusory and false assertion that Respondent "would not have been terminated and/or had other adverse employment actions taken against him if he were a woman." (*Id.* at ¶ 52). Respondent then proceeds to undercut his own allegations of discrimination by stating, in a claim for "Civil Conspiracy," that he was not fired because of his age or sex, but rather because Petitioners "intentionally and maliciously agreed to a knowingly false plan to terminate Plaintiff 'for cause,' in a bad faith effort to quell the Diet Madison Avenue attacks against CP+B." (*Id.* at ¶ 59).

Several of the claims in the Amended Complaint rely on this allegation, for which Respondent's factual support is limited to: (i) general denials of wrongdoing by Respondent; and (ii) CP+B's refusal to compromise the confidentiality of its investigation process by publicly revealing the identities of those who participated in it. For example, Respondent asserts a claim for defamation, stating that CP+B's upper management "intentionally and maliciously spread and published knowingly false statement(s) that Plaintiff was terminated 'for cause' based on unspecified, undisclosed and/or made-up harassment charges." (*Id.* at ¶ 78). Critically, Respondent fails to allege any of the elements of that claim because he fails to identify who specifically made the alleged defamatory statements, the actual content of such statements, and

to whom they were made.

The Amended Complaint also includes a claim for intentional interference with contract against Petitioners Gendel and Nelson, but fails to mention what Gendel and Nelson actually *did* to interfere with Respondent's contract (beside suggesting that Gendel and Nelson, in their capacity as General Counsel of MDC and Global Chief Financial Officer of CP+B, participated in the decision to terminate Respondent for cause). (*Id.* at ¶ 77-86). Indeed, the only factual allegation against Petitioner Gendel is that he signed and delivered to Respondent a letter terminating Respondent's employment for cause. (*Id.* at ¶ 28). Petitioner Nelson is not even mentioned in the Amended Complaint's "Statement of Facts" section. (*Id.* at ¶ 9-33).

Respondent further claims Petitioners interfered with his prospective economic relations. (*Id.* at ¶ 98-109). The Amended Complaint makes no mention of the specific economic relations with which Petitioners allegedly interfered, only speculatively referencing a "highly lucrative freelance advertising campaign" that Respondent allegedly lost out on. (*Id.* at ¶ 103). Respondent also fails to allege what concrete actions, other than terminating him for cause, Petitioners took to interfere. Respondent additionally asserts a claim for intentional infliction of emotional distress, but the only alleged act by Petitioners on which Respondent relies, again, is Respondent's for-cause termination. (*Id.* at ¶ 110-116). Finally, Respondent asserts breach of contract by CP+B and MDC, claiming Respondent's conduct did not constitute "cause" under the Agreement. (*Id.* at ¶ 134).

Respondent, by signing the Agreement, specifically and expressly agreed to submit the claims asserted in the Amended Complaint to arbitration. (*See* Rubin Decl. at ¶ 2, Exh. A, § 18) (expressly listing the very claims alleged in the Amended Complaint, including claims for "wrongful discharge of employment," "breach of contract," "intentional infliction of emotional

distress," "intentional interference with contract or prospective economic advantages," "defamation," and "[a]ny and all claims for violation of…Title VII of the Civil Rights Act of 1964, as amended,…the Age Discrimination in Employment Act of 1967,…[and] the Colorado Antidiscrimination Act of 1957, as amended" as being subject to arbitration).

### C. RESPONDENT ARGUES COLORADO COURT LACKS AUTHORITY

On July 25, 2018, Petitioners filed a motion with the District Court in Colorado to compel arbitration and to dismiss the Amended Complaint (or in the alternative, to stay the action pending arbitration). On August 3, 2018, despite filing the Amended Complaint in Colorado to begin with, Respondent then argued that the Agreement required that a suit to compel arbitration be brought in this court, and that the federal court in Colorado lacked authority to compel arbitration in New York. Thus Petitioners have been forced to ask this court to intervene and compel arbitration, and dismiss or stay the Colorado action pending arbitration.

## ARGUMENT

For the reasons set forth below, the Court should dismiss the Colorado action pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, or alternatively, stay the action pending arbitration pursuant to Section 3 of the Federal Arbitration Act ("FAA"), and compel the parties to proceed to arbitration pursuant to Section 4 of the FAA, in accordance with the terms of the Agreement.

Under Rule 12(b)(1), a federal district court lacks jurisdiction where the parties' entire dispute is subject to a binding arbitration agreement. *Lewis Tree Serv., Inc. v. Lucent Techs., Inc.*, 239 F. Supp. 2d 332, 340 (S.D.N.Y. 2002) (a court may dismiss such an action because "no useful purpose will be served by granting a stay."). Arbitration provisions in employment agreements are generally governed by the FAA, which was designed, in part, to "ensure judicial enforcement of privately made agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd*,

470 U.S. 213, 219 (1985). Courts have long recognized a strong federal policy favoring the enforcement of arbitration agreements, which are construed as broadly as possible. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018); *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 76 (2d Cir. 1998). Moreover, "the existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that [it] covers the asserted dispute." *Id.* At 76 (internal citation omitted).

The Second Circuit instructs the district courts to consider the following factors in determining whether an action should be sent to arbitration:

> First, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration.

*JLM Indus. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004). The instant action certainly meets this test, requiring arbitration of all the claims asserted in the Amended Complaint and the dismissal (or stay) of the pending action.

## I. THE PARTIES AGREED TO ARBITRATE.

Based on a plain reading of the Agreement and Respondent's signature thereon, there can be no dispute that Respondent and Petitioners agreed to arbitrate. (*See* Rubin Decl. at ¶ 2, Exh. A). Respondent accepted the arbitration provision (which sets forth in no uncertain terms, and in conspicuous bold letters, that any dispute arising out of Respondent's employment would be exclusively subject to final and binding arbitration) because, independently and collectively, Respondent: (i) executed and delivered the Agreement in consideration for his employment; and (ii) Respondent remained employed under the Agreement for almost four years after signing.

*Brown v. Coca-Cola Enters.*, 2009 U.S. Dist. LEXIS 35798, at *21 (E.D.N.Y. Apr. 28, 2009) (employee consented to mandatory arbitration by remaining employed after it went into effect). Respondent does not challenge the validity of the Agreement in general, or the arbitration clause specifically, in his Amended Complaint. The Amended Complaint, in fact, describes the Agreement's execution (*see* Rubin Decl. at ¶ 3, Exh. B, ¶ 10), references the Agreement throughout the Amended Complaint, and relies on its validity for several of his claims, most notably his claim for breach of contract. (*See id.* at ¶ 123-137).

## II. THE SCOPE OF THE ARBITRATION AGREEMENT COVERS THE CLAIMS ASSERTED IN THE INSTANT ACTION.

### A. THE ARBITRATION AGREEMENT COVERS CLAIMS AGAINST ALL THE PETITIONERS.

The arbitrability of Respondent's claims is unaffected by the fact that Petitioners Gendel and Nelson (collectively the "Individual Petitioners") and MDC are non-signatories to the Agreement. Claims involving non-signatories to an arbitration agreement are nonetheless subject to arbitration where there is a close relationship and where the claims are intertwined with the underlying contractual obligations. *See JLM Inds., Inc.*, 387 F.3d at 177 ("under principles of estoppel, a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of the relationship among the parties, the contracts they signed, and the issues that had arisen among them discloses that the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed") (internal quotations omitted); *Birmingham Assocs. v. Abbott Labs.*, 547 F. Supp. 2d 295, 301 (S.D.N.Y. 2008) (non-signatory can compel arbitration on an estoppel theory where "(i) there is a close relationship between the parties and controversies involved and (ii) the signatory's claims against the non-signatory are 'intimately founded in and intertwined with the underlying' agreement containing the arbitration clause.").

***(i) The Individual Petitioners are Covered by the Arbitration Agreement.***

Petitioners Gendel (MDC's General Counsel and CP+B's Vice President and Secretary) and Nelson (CP+B's Global Chief Financial Officer), though not signatories to the Agreement, may still compel Respondent to arbitrate his claims against them. *See Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 668 (2d Cir. 1997) ("Courts in this and other circuits consistently have held that employees or disclosed agents of an entity that is a party to an arbitration agreement are protected by that agreement."); *Cicchetti v. Davis Selected Advisors*, 2003 U.S. Dist. LEXIS 20747, at *9 (S.D.N.Y. Nov. 17, 2003) (former employee's claims against former employer and supervisor were subject to arbitration, even though supervisor was not a signatory to the arbitration agreement, because plaintiff's claims "involve the very same issues and circumstances and are all directly related to [plaintiff's] employment with," and claims against, plaintiff's employer).

All of Respondent's claims make reference to, and are connected with, Respondent's rights and obligations under the Agreement. The sole factual basis for Respondent's allegations, which the Amended Complaint essentially repeats (with somewhat different phrasing) with respect to each claim, is CP+B/MDC's decision to terminate Respondent's employment for cause. That action was taken pursuant to the Agreement, and any ancillary allegations clearly arise from Petitioners' exercise of their contractual rights under the Agreement. *See Bimota SPA v. Rousseau*, 628 F. Supp. 2d 500, 505 (S.D.N.Y. 2009) ("[Plaintiff] is estopped from avoiding arbitration as required under the Agreement while asserting claims that are linked with the provisions of that same Agreement."). Each claim in the Amended Complaint incorporates by reference the Amended Complaint's "Statement of Facts" section, which cites the Agreement numerous times.

The Amended Complaint, moreover, refers to actions by "Defendants," and generally does not specifically assign liability to Individual Petitioners.[3] Even where Respondent alleges a claim only against the Individual Petitioners, such claim arises out of the same facts and circumstances as those against CP+B, and could not exist but for Respondent's employment with the company and termination therefrom. Indeed, Respondent does not allege any facts concerning the Individual Petitioners *other* than with respect to Respondent's employment with CP+B. Accordingly, the claims against Petitioners Gendel and Nelson must be found to come within the scope of the Agreement's arbitration provision.

***(ii) MDC is Covered by the Arbitration Agreement***

Similarly, although MDC is not a signatory to the Agreement, Respondent's claims against MDC must be arbitrated. Under the same equitable principles outlined above, a signatory-plaintiff cannot escape his own commitment to arbitrate merely by naming his signatory-employer's non-signatory parent as a defendant. *See Jalee Consulting Grp., Inc. v. XenoOne, Inc.*, 908 F. Supp. 2d 387, 401 (S.D.N.Y. 2012) (noting the Second Circuit "has tended to apply estoppel in cases where the non-signatory party asserting estoppel has had some sort of corporate relationship to a signatory party; that is,…in cases involving subsidiaries, affiliates, agents, and

[3] Claim V of the Amended Complaint (*see* Rubin Decl. at ¶ 3, Exh. B, ¶ 88-97) for "Intentional Interference with Contract" is Respondent's only claim asserted against the Individual Petitioners specifically. In an apparent attempt to bring this claim outside the scope of the arbitration agreement, Respondent states, without evidence or explanation, that the Individual Petitioners were "acting at least in part outside the scope of their respective employment duties" with regard to their alleged conduct. (*Id.* at ¶ 90). This conclusory and inaccurate assertion contradicts the Amended Complaint's central theme: that Respondent was terminated for cause *in order to protect CP+B* from the uproar caused by the Diet Madison Avenue publications. It also disregards the obvious fact that terminating a senior executive for cause is squarely within the scope of duties of the General Counsel of MDC and Vice President and Secretary of CP+B, and the Global Chief Financial Officer of CP+B. If the allegations in the Amended Complaint are true, Petitioners Gendel and Nelson were plainly acting in their official capacity as officers and agents of MDC and CP+B. Indeed, Respondent does not and cannot offer an alternative explanation for their alleged actions.

other related business entities.") (citing *Ross v. Am. Express Co.*, 547 F.3d 137, 144 (2d Cir. 2008) (internal quotations omitted).

As the Amended Complaint makes clear, Respondent alleges interconnected and concerted conduct by CP+B and MDC with regard to Respondent's employment and termination. He states that Petitioner Gendel, who is both the General Counsel of MDC and the Vice President and Secretary of CP+B, was the one to notify Respondent of his termination. (Rubin Decl. at ¶ 3, Exh. B, ¶ 28). Respondent uses the defined term "Defendant Employers" to refer to CP+B and MDC collectively (*see* Rubin Decl. at ¶ 3, Exh. B, ¶ 5), and alleges claims against either "All Defendant Employers" or "All Defendants" throughout the Amended Complaint. Respondent asserts no claims against either CP+B or MDC specifically, and generally does not specify which company took alleged actions, instead simply referencing conduct by "Defendants." *See Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 97 (2d Cir. 1999) (where a plaintiff treats all defendants as a single unit in his complaint, it further supports estopping that plaintiff from shielding himself from arbitrating with certain defendants).

Moreover, Respondent names MDC as a defendant in his breach of contract claim, himself alleging that MDC is a party to the Agreement and thus covered by its arbitration provision. (*See, e.g.,* Rubin Decl. at ¶ 3, Exh. B, ¶ 128 (describing the Agreement as "Plaintiff's Employment Agreement with the Defendant Employers")). Under such circumstances, a plaintiff cannot use a contract as both a "sword and a shield." *See Denney v. Jenkens & Gilchrist*, 412 F. Supp. 2d 293, 298 (S.D.N.Y. 2005) ("The purpose of the doctrine of equitable estoppel is to prevent a plaintiff from, in effect, trying to have his cake and eat it too; that is, from relying on the contract when it works to [his] advantage [by establishing the claim], and repudiating it when it works to [his] disadvantage [by requiring arbitration]") (internal quotations

omitted); *see also Ranieri v. Bell Atl. Mobile*, 304 A.D.2d 353, 354, 759 N.Y.S.2d 448, 449 (App. Div. 2003) ("plaintiff's claim that the nonsignatory defendants are not entitled to the benefit of the arbitration provision contained in the Agreements is inconsistent with his claim that they are liable to him under those Agreements for breaches of contract").

**B. THE ARBITRATION AGREEMENT COVERS ALL OF RESPONDENT'S CLAIMS.**

Given the scope of the arbitration clause in the Agreement, the clause clearly encompasses all of Respondent's claims. Where the existence of an arbitration agreement is established, any doubts as to whether a claim falls within the scope of such agreement should be resolved in favor or arbitrability. *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 223 (2d Cir. 2001). In analyzing the scope of an arbitration clause, courts first classify the particular clause as either broad or narrow. *Id.* at 224. Where the arbitration clause is broad, there arises a presumption or arbitrability, and a court will order arbitration of even a collateral matter if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it. *Id.* This presumption "is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 395 (2d Cir. 2015) (internal quotation marks omitted).

Section 18 of the Agreement clearly provides for broad arbitrability, and expressly covers *precisely* the claims in the Amended Complaint. It applies to "**any claims arising out of, relating to, or in connection with this Agreement, or the interpretation, validity, construction, performance, breach or termination thereof, or [Respondent's] employment or the termination thereof**." (*See* Rubin Decl. at ¶ 2, Exh. A, ¶ 18(b)) (bold letters in original). It explicitly includes among arbitrable claims *all* the claims alleged in the Amended Complaint, including: "**[a]ny and all claims for wrongful discharge or employment, breach of contract,**

**both express and implied; breach of the covenant of good faith and fair dealing, both express and implied; negligent or intentional infliction of emotional distress;…negligent or intentional interference with contract or prospective economic advantage; and defamation,**" as well as "**[a]ny and all claims for violation of any federal, state or municipal statute, including, without limitation, Title VII of the Civil Rights Act of 1964, as amended,…the Age Discrimination in Employment Act of 1967,…[and] the Colorado Antidiscrimination Act of 1957, as amended**." (*Id.*)[4]

Courts construing arbitration agreements with similar language regarding scope have found such clauses to be broad. *See, e.g.*, *Watson v. USA Today Sports Media Grp., LLC*, 2018 U.S. Dist. LEXIS 79295, at *5 (S.D.N.Y. May 8, 2018) (noting the arbitration clause which covered "any dispute arising under this Agreement" was the "a paradigmatic 'broad' arbitration clause"). Under a presumption of arbitrability, courts have routinely found claims like Respondent's to come within the scope of a broad clause. *See, e.g.*, Donner v. GFI Capital Res. Grp., 2017 U.S. Dist. LEXIS 68405 (S.D.N.Y. May 2, 2017) (employment discrimination and tortious interference with business relations); *Waumboldt v. Callimanopulos*, 2012 U.S. Dist. LEXIS 118231, at *12 (S.D.N.Y. Aug. 20, 2012) (intentional infliction of emotional distress); *Abbott v. Keen, Inc.*, 2014 U.S. Dist. LEXIS 166877, at *19-20 (D. Vt. May 7, 2014) (tortious interference and defamation).

Respondent's Age and "Reverse Sex" Discrimination claims clearly arise in connection with Respondent's employment with CP+B and the termination thereof, and are thus covered by the Agreement's arbitration clause. His defamation claim states that Petitioners published

[4] The only cause of action in the Amended Complaint that is not specifically enumerated in the Agreement's arbitration clause is Claim III ("Civil Conspiracy"). Civil conspiracy is not itself a tort, but rather relies on the underlying acts being unlawful and creating an independent cause of action. *Gross v. Empire Healthchoice Assurance, Inc.*, 819 N.Y.S.2d 210 (Sup. Ct. 2006).

statements that Respondent was terminated for cause, an exercise of Petitioners' contractual rights under the Agreement, and therefore arises in connection with the Agreement, "or the…performance, breach or termination thereof." The intentional interference with contract claim cites the Agreement as the contract that was allegedly interfered with, and suggests that Petitioners' exercising their right to terminate Respondent for cause under that contract constituted "interference" with it. The intentional interference with prospective economic relations and intentional infliction of emotional distress claims essentially restate Respondent's defamation claim, and again only allege actions by Petitioners' *pursuant to the Agreement*. The claims for wrongful discharge and breach of contract plainly arise out of Respondent's "employment or the termination thereof." Moreover, the arbitration provision in the Agreement specifically names all of the above claims as being among those subject to arbitration.

Given the broad language in the Agreement's arbitration provision and the obvious connection between Respondent's claims and his employment with and termination from CP+B, the entirety of the Amended Complaint is subject to mandatory arbitration.

**C. RESPONDENT'S STATUTORY CLAIMS ARE ARBITRABLE.**

It is well-settled that Respondent's ADEA and Title VII claims, like his non-statutory claims, are arbitrable. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 23 (1991) (ADEA); *Desiderio v. NASD*, 191 F.3d 198, 200 (2d Cir. 1999) (Title VII).

**D. A STAY (OR IN THE ALTERNATIVE DISMISSAL) OF THE CASE IS WARRANTED.**

Where, as here, the only claims at issue are subject to final and binding arbitration under a valid arbitration agreement, the Court should dismiss the case because "no useful purpose will be served by granting a stay." *Lewis Tree Serv., Inc. v. Lucent Techs., Inc.*, 239 F. Supp. 2d 332, 340 (S.D.N.Y. 2002).

In the alternative, should the Court decide not to dismiss the action in whole or in part,

Petitioners respectfully submit that the Court is required to stay the action pending the outcome of the arbitration of this matter, pursuant to Section 3 of the FAA, which states that:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. This is not discretionary. *See, e.g., Lloyd v. Hovensa*, *LLC,* 369 F.3d 263, 269 (3d Cir. 2004) (noting that "the plain language of § 3 [of the FAA] affords a district court no discretion to dismiss a case where one of the parties applies for a stay pending arbitration," because "the statute clearly states, without exception, that whenever suit is brought on an arbitrable claim, the Court 'shall' upon application stay the litigation until arbitration has been concluded.").

For the reasons set forth above and based on the plain reading of the express terms of the Agreement, this Court should dismiss the Amended Complaint (or in the alternative, stay the action) and compel arbitration. For purposes of judicial efficiency, Petitioners should not be required to respond to the Amended Complaint (if at all) until the Court has ruled on this Motion.

## CONCLUSION

For the foregoing reasons, Petitioners' Motion to dismiss (or in the alternative, to stay) this action and to compel arbitration should be granted. In the event the Court denies this Motion, Petitioners should not be required to respond to the Amended Complaint until 20 days after the Court's ruling on this Motion.

Dated: August 22, 2018

Respectfully submitted,

*s/ Howard J. Rubin*

Howard J. Rubin
Nicholas M. Joseph
DAVIS & GILBERT LLP
1740 Broadway
New York, NY 10019
Telephone: 212.468.4800
Facsimile: 212.468.4888
Email: hrubin@dglaw.com
njoseph@dglaw.com

*Attorneys for Petitioners Crispin Porter & Bogusky LLC, MDC Partners Inc., Mitchell Gendel and Dusty Nelson*